UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA<br>1401 H Street, NW - Suite 4000<br>Washington, DC 20530,<br><br>Plaintiff,<br><br>v.<br><br>UNITEDHEALTH GROUP INCORPORATED<br>9900 Bren Road East<br>Minnetonka, MN 55343, and<br><br>SIERRA HEALTH SERVICES, INC.<br>2724 North Tenaya Way<br>Las Vegas, NV 89128,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil No.<br><br>Filed: |

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the

United States, brings this civil action to enjoin UnitedHealth Group Incorporated ("United") from

acquiring Sierra Health Services, Inc. ("Sierra"), and alleges as follows:

1.      Unless enjoined, United's proposed acquisition of Sierra will substantially

increase concentration in an already highly concentrated market that is no broader than Medicare

Advantage health insurance plans sold to senior citizens ("seniors") and other Medicare-eligible

individuals in Clark and Nye Counties, Nevada, ("the Las Vegas area"). As defined by federal

law, Medicare Advantage plans consist of Medicare Advantage health maintenance organization

plans ("MA-HMO"), Medicare Advantage preferred provider organization plans ("MA-PPO"),

and Medicare Advantage private fee-for-service plans ("MA-PFFS"). *See* 42 U.S.C. § 1395w-21(a)(2). United and Sierra together account for approximately 94 percent of the total enrollment in Medicare Advantage plans in the Las Vegas area, which total accounts for approximately $840 million in annual commerce.

2.      Congress created the Medicare Advantage program as a private market alternative to government-provided traditional Medicare. In establishing the Medicare Advantage program, Congress intended that vigorous competition among private Medicare Advantage insurers would lead insurers to offer seniors richer and more affordable benefits than traditional Medicare, provide a wider array of health-insurance choices, and be more responsive to the demands of seniors.

3.      The acquisition will decrease competition substantially among Medicare Advantage plans in the Las Vegas area and eliminate substantial head-to-head competition between United (through the PacifiCare health insurance business that United acquired in 2005) and Sierra in the provision of such plans. The competition between United and Sierra has, for years, benefited thousands of seniors. Through competition, United's and Sierra's plans provide seniors with substantially greater benefits than those available under traditional Medicare alternatives, saving seniors thousands of dollars in yearly health care costs. The proposed acquisition will end that competition, eliminating the pressure that these close competitors place on each other to maintain attractive benefits, lower prices, and high-quality health care.

4.      United's acquisition of Sierra is likely to reduce competition substantially in the sale of Medicare Advantage plans in the Las Vegas area in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. Accordingly, the United States seeks an order permanently enjoining the transaction.

## I. JURISDICTION AND VENUE

5.      The United States files this Complaint pursuant to Sections 15 and 16 of the Clayton Act, as amended, 15 U.S.C. §§ 25 and 26, to prevent and restrain the defendants from violating Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

6.      United and Sierra are engaged in interstate commerce and in activities that substantially affect interstate commerce. The Court has jurisdiction over this action pursuant to Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337.

7.      United and Sierra transact business and are found in the District of Columbia. Venue is proper under 15 U.S.C. § 22 and 28 U.S.C. § 1391(c).

## II. THE DEFENDANTS AND THE PROPOSED TRANSACTION

8.      United is a corporation organized and existing under the laws of Minnesota and has its principal place of business in Minnetonka, Minnesota. United is the largest health insurer in the United States, providing health insurance and other services to more than 70 million people nationwide. In 2007, United reported revenues of approximately $75 billion.

9.      United's Medicare Advantage products are sold under the Secure Horizons and AARP brands. United provides health insurance to approximately 27,800 Medicare Advantage enrollees in the Las Vegas area. Approximately 26,000 of these enrollees are individual enrollees whose enrollment is not affiliated with an employer or other group. The remainder are group retirees who enrolled in a United Medicare Advantage plan through an employer or other group.

10.     In the Las Vegas area, United has a well-established managed-care network that United uses to provide services to enrollees in its MA-HMO plans. Health care services

provided by HealthCare Partners, LLC, The Physicians IPA, Inc., and Summit Medical Group are an integral part of United's managed-care network in the Las Vegas area.

11.    Sierra is a corporation organized and existing under the laws of Nevada and has its principal place of business in Las Vegas, Nevada. Sierra is the largest health insurer in Nevada, providing health insurance and other services to more than 655,000 people. In 2007, Sierra reported revenues of $1.9 billion.

12.    Sierra sells Medicare Advantage plans under the Senior Dimensions, Sierra Spectrum, Sierra Nevada Spectrum, and Sierra Optima Select brands. Sierra provides health insurance to approximately 49,500 Medicare Advantage enrollees in the Las Vegas area.

13.    Sierra owns Las Vegas's largest medical group, Southwest Medical Associates, Inc. ("SMA"), which employs approximately 250 physicians and other health care professionals. SMA provides care almost exclusively to Sierra members and provides a substantial portion of the care delivered to Sierra's Medicare Advantage members.

14.    On March 11, 2007, United and Sierra entered into a merger agreement, whereby United agreed to acquire all outstanding shares of Sierra. The transaction is valued at approximately $2.6 billion.

### III. THE MEDICARE ADVANTAGE INSURANCE MARKET

15.    The federal government provides and facilitates the provision of health insurance to millions of Medicare-eligible citizens through two types of programs: traditional Medicare (also known as Original Medicare) and Medicare Advantage. Under traditional Medicare, a beneficiary receives hospital coverage under Medicare Part A and can elect to receive coverage for physician and out-patient services under Part B. For Part A, the government charges no monthly premium if the beneficiary was in the workforce and paid Medicare taxes, but for Part

4

B, the government deducts a monthly premium (currently $96.40 for most beneficiaries) from beneficiaries' Social Security checks. In addition, beneficiaries must pay deductibles and/or co-insurance for doctor visits and hospital stays. If beneficiaries want to limit potentially catastrophic out-of-pocket costs, they need to purchase a separate Medicare Supplement plan. For prescription drug coverage, seniors enrolled in traditional Medicare must purchase Medicare Part D drug coverage for an additional premium.

16.    In contrast, Medicare Advantage plans are offered by private insurance companies. These companies compete to offer the most attractive Medicare Advantage benefits to enrollees in a region. Most successful Medicare Advantage plans, including those in the Las Vegas area, offer substantially richer benefits at lower costs to enrollees than traditional Medicare, including lower co-payments, lower co-insurance, caps on total yearly out-of-pocket costs, prescription drug coverage, vision coverage, health club memberships, and other benefits that traditional Medicare does not cover.

17.    An insurance company that seeks to offer a Medicare Advantage plan in a region must submit a bid to the Centers for Medicare and Medicaid Services ("CMS") for each Medicare Advantage plan that it intends to offer. The bid must provide the insurer's anticipated costs per member to cover the basic Medicare Part A and Part B benefits. Those costs, including an anticipated profit margin, are compared to a Medicare benchmark that reflects, in part, the government's likely cost of covering the beneficiaries. If the insurer's bid for Medicare benefits is lower than the benchmark, the Medicare program retains 25 percent of the savings and the insurer must use the other 75 percent to provide supplemental benefits or lower premiums to enrollees. Accordingly, the lower the insurer's projected costs, the more benefits seniors enrolled in the insurer's plan will have available to them.

5

18.     A sufficient number of seniors in the Las Vegas area would not switch away from Medicare Advantage plans to traditional Medicare in the event of a small but significant reduction in benefits under the plans, or a small but significant increase in price, to render the benefit decrease or price increase unprofitable.  Accordingly, in the Las Vegas area, the sale of Medicare Advantage plans is a relevant product market and a line of commerce under Section 7 of the Clayton Act, 15 U.S.C. § 18.

## IV.  RELEVANT GEOGRAPHIC MARKET

19.     Residents in the Las Vegas area (Clark and Nye Counties) may only enroll in Medicare Advantage plans that CMS approves for the county in which they live.  Consequently, they could not turn to Medicare Advantage plans elsewhere in the state or in other regions in response to a reduction in competition between Sierra and United in the Las Vegas area.  Accordingly, the Las Vegas area is a relevant geographic market or section of the country within the meaning of Section 7 of the Clayton Act.

## V.  MARKET CONCENTRATION

20.     The market for Medicare Advantage plans is highly concentrated and would become significantly more concentrated as a result of the proposed acquisition.  Sierra accounts for approximately 60 percent of Medicare Advantage enrollees in the Las Vegas area.  United accounts for approximately 34 percent.  If consummated, the merger would give United a 94 percent market share.  The Herfindahl-Hirschman Index ("HHI") (a standard measure of market concentration defined and explained in Appendix A) for the Las Vegas area Medicare Advantage market indicates that the market is highly concentrated.  The proposed merger would increase concentration by 4,080 points, from 4,756 to 8,836.

6

21.     Sierra and United (through PacifiCare) have accounted for well over 90 percent of Medicare Advantage enrollment in the Las Vegas area for each of the past seven years.

## VI. ANTICOMPETITIVE EFFECTS

22.     Under the Medicare Advantage program, private competition for Medicare-eligible individuals has produced substantial benefits for consumers throughout the country, including in the Las Vegas area.

23.     Sierra and United have competed vigorously with each other to improve their Medicare Advantage plans and attract members. They monitor each other's benefits to stay competitive and consider each other to be very important competitors.

24.     United and Sierra compete against each other for newly Medicare-eligible individuals, try to attract members from each other, and seek to avoid losing members to each other, by offering plans with zero premiums, reducing co-payments, eliminating deductibles, improving drug coverage, offering desirable fitness benefits, and attempting to make their provider networks more attractive to potential members. Such competition will be lost in the Las Vegas area if the proposed acquisition is completed, to the substantial detriment of tens of thousands of seniors. After the acquisition, the combined United/Sierra will not have the same incentive to improve benefits as the two separate companies do today, and likely will raise prices or reduce benefits and services.

25.     Competition from existing providers of Medicare Advantage plans and new entrants is unlikely to prevent anticompetitive effects. Such firms face substantial cost, reputation, and distribution disadvantages that will likely make them unable to prevent United from raising prices or reducing benefits and services.

26.    Accordingly, the proposed transaction likely will substantially lessen competition in violation of Section 7 of the Clayton Act.

## VII.  VIOLATIONS ALLEGED

27.    United's acquisition of Sierra would likely substantially lessen competition in the sale of Medicare Advantage health insurance in the Las Vegas area, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

28.    The proposed transaction would likely have the following effects, among others:

(a)    lessening substantially actual and potential competition in the sale of Medicare Advantage insurance;

(b)    eliminating actual and potential competition between United and Sierra in the sale of Medicare Advantage insurance;

(c)    increasing prices for Medicare Advantage insurance above those that would prevail absent the acquisition; and

(d)    decreasing the level of benefits and service associated with Medicare Advantage insurance to levels below those that would prevail absent the acquisition.

## VIII.  PRAYER FOR RELIEF

The United States requests that this Court:

1.    Adjudge the proposed acquisition to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

2.    Permanently enjoin and restrain the defendants from carrying out the Agreement and Plan of Merger between United and Sierra dated March 11, 2007, or from entering into or

carrying out any agreement, understanding, or plan by which United would merge with or acquire

Sierra, its capital stock, or any of its assets;

    3.    Award the United States the costs of this action; and

    4.    Award the United States such other relief as the Court may deem just and proper.

                                        Respectfully submitted,

_____        _____
Thomas O. Barnett (D.C. Bar # 426840)    Peter J. Mucchetti (D.C. Bar # 463202)
Assistant Attorney General                Mitchell H. Glende
Antitrust Division                     N. Christopher Hardee (D.C. Bar # 458168)
                                 Tiffany C. Joseph-Daniels
                                 Barry J. Joyce
_____        Ryan M. Kantor
Deborah A. Garza (D.C. Bar # 395259)   John P. Lohrer (D.C. Bar # 438939)
Deputy Assistant Attorney General      Richard S. Martin
Antitrust Division                     Natalie A. Rosenfelt
                                 Michelle Seltzer (D.C. Bar # 475482)
_____        Trial Attorneys
Patricia A. Brink                     U.S. Department of Justice
Deputy Director of Operations        Antitrust Division
Antitrust Division                     Litigation I Section
                                 1401 H Street, NW, Suite 4000
                               Washington, D.C.  20530
_____        (202) 353-4211
Joshua H. Soven (D.C. Bar # 436633)    (202) 307-5802 (fax)
Chief, Litigation I Section
Antitrust Division

_____        DATED:  February 25, 2008
Joseph Miller (D.C. Bar # 439965)
Assistant Chief, Litigation I Section
Antitrust Division

**APPENDIX A**

### Herfindahl-Hirschman Index

"HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. It is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30%, 30%, 20%, and 20%, the HHI is 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$). The HHI takes into account the relative size distribution of the firms in a market and approaches zero when a market consists of a large number of small firms. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1000 and 1800 points are considered to be moderately concentrated, and those in which the HHI is in excess of 1800 points are considered to be highly concentrated. *See Horizontal Merger Guidelines* ¶ 1.51 (revised Apr. 8, 1997). Transactions that increase the HHI by more than 100 points in concentrated markets presumptively raise antitrust concerns under the guidelines issued by the U.S. Department of Justice and Federal Trade Commission. *See id.*

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing Complaint, proposed Final Judgment, Competitive Impact Statement, Hold Separate and Asset Preservation Stipulation and Order, and Explanation of Consent Decree Procedures via e-mail and first class, United States mail on February 25, 2008.

FOR DEFENDANT UNITEDHEALTH GROUP INC.

Robert E. Bloch, Esq.
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, DC 20006-1101

Steven L. Holley, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004

FOR DEFENDANT SIERRA HEALTH SERVICES, INC.:
Arthur N. Lerner, Esq.
Crowell & Moring LLP
1001 Pennsylvania Ave. NW
Washington, DC 20004


Peter J. Mucchetti
Attorney
Litigation I Section
U.S. Department of Justice - Antitrust Division

**JS-44**
**(Rev.1/05 DC)**

CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America | UnitedHealth Group Incorporated<br>Sierra Health Services, Inc. |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY) _____ 88888
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Peter J. Mucchetti, Esq.<br>United States Department of Justice<br>1401 H Street, NW, Suite 4000<br>Washington, DC 20530<br>(202) 353-4211 | UnitedHealth Group Incorporated: Robert E. Bloch, Esq., Mayer Brown<br>LLP, 1909 K Street, NW, Washington, DC 20006, (202) 263-3203<br>Sierra Health Services, Inc.: Arthur N. Lerner, Esq., Crowell & Moring,<br>1001 Pennsylvania Ave., NW, Washington, DC 20004, (202) 624-2820 |

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

⊙ 1 U.S. Government
Plaintiff

○ 3 Federal Question
(U.S. Government Not a Party)

○ 2 U.S. Government
Defendant

○ 4 Diversity
(Indicate Citizenship of
Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX

FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place<br>of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place<br>of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a<br>Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

⊙ **A. Antitrust**

[X] 410 Antitrust

○ **B. Personal Injury/
Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency
Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
Administrative Agency is Involved)

○ **D. Temporary Restraining
Order/Preliminary
Injunction**

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

---

○ **E. General Civil (Other)**          OR          ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
defendant
☐ 871 IRS-Third Party 26
USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure
of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced &
Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge 12 USC
3410
☐ 900 Appeal of fee determination
under equal access to Justice
☐ 950 Constitutionality of State
Statutes
☐ 890 Other Statutory Actions (if
not administrative agency
review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General <br> ☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) <br><br> *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act <br> ☐ 890 Other Statutory Actions (if Privacy Act) <br><br> *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act <br> ☐ 720 Labor/Mgmt. Relations <br> ☐ 730 Labor/Mgmt. Reporting & Disclosure Act <br> ☐ 740 Labor Railway Act <br> ☐ 790 Other Labor Litigation <br> ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) <br> ☐ 443 Housing/Accommodations <br> ☐ 444 Welfare <br> ☐ 440 Other Civil Rights <br> ☐ 445 American w/Disabilities- Employment <br> ☐ 446 Americans w/Disabilities- Other | ☐ 110 Insurance <br> ☐ 120 Marine <br> ☐ 130 Miller Act <br> ☐ 140 Negotiable Instrument <br> ☐ 150 Recovery of Overpayment & Enforcement of Judgment <br> ☐ 153 Recovery of Overpayment of Veteran's Benefits <br> ☐ 160 Stockholder's Suits <br> ☐ 190 Other Contracts <br> ☐ 195 Contract Product Liability <br> ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi district Litigation ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Civil antitrust action to enjoin United Health Group's proposed acquisition of Sierra Health Services, Section 7 of the Clayton Act, 15 U.S.C. 18.

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   **DEMAND $** _____ Check YES only if demanded in complaint  **JURY DEMAND:** YES ☐ NO ☒

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐ NO ☒ If yes, please complete related case form.

**DATE** February 2008  **SIGNATURE OF ATTORNEY OF RECORD** _____

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. |
| | ) | |
| UNITEDHEALTH GROUP | ) | Filed: |
| INCORPORATED and | ) | |
| SIERRA HEALTH SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF UNITED STATES'
## EXPLANATION OF CONSENT DECREE PROCEDURES

Plaintiff United States of America submits this memorandum summarizing the

procedures for entry of the proposed Final Judgment as set forth by the Antitrust Procedures and

Penalties Act, 15 U.S.C. §§ 16(b)-(h) (the "APPA"), which applies in civil antitrust cases

brought and settled by the United States. As described below, the APPA provides that certain

events must occur prior to the Court's signing and entering the proposed Final Judgment to

resolve this case.

1.      Today, Plaintiff has filed a Complaint, proposed Final Judgment, Competitive

Impact Statement, and Hold Separate and Asset Preservation Stipulation and Order (the "Hold

Separate").

2.      Defendants have agreed in the Hold Separate that they will abide by the terms of

the proposed Final Judgment in the interim and also follow certain procedures described in the

Hold Separate between consummation of their merger and the divestitures required by the

proposed Final Judgment. At this time, we ask that the Court only sign the Hold Separate.

3.      The Hold Separate also contains the parties' agreement that, after compliance with the APPA, the Court may enter the proposed Final Judgment. The APPA requires that Plaintiff publish the proposed Final Judgment and the Competitive Impact Statement in the *Federal Register* and in certain newspapers at least sixty (60) days prior to entry of the proposed Final Judgment. The notice will inform members of the public that they may submit comments about the proposed Final Judgment to the United States Department of Justice, Antitrust Division (*see* 15 U.S.C. §§ 16(b)-(c)).

4.      During the sixty-day period, Plaintiff will consider, and at the close of that period respond to, any comments that it has received, and it will publish the comments and Plaintiff's responses in the *Federal Register*.

5.      After the expiration of the sixty-day period, Plaintiff will file with the Court the comments and Plaintiff's responses, and Plaintiff either will ask the Court to enter the Final Judgment (subject to any proposed revisions) or will withdraw its consent to entry of the Final Judgment, as provided in Section IV(A) of the Stipulation (*see* 15 U.S.C. § 16(d)).

6.      If Plaintiff requests that the Court enter the proposed Final Judgment after

compliance with the APPA, 15 U.S.C. §§ 16(e)-(f), then the Court may enter the Final Judgment

without a hearing, provided that the Court concludes that the Final Judgment is in the public

interest.

Dated:  February 25, 2008

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA

Peter J. Mucchetti (D.C. Bar # 463202)
Litigation I Section
United States Department of Justice
Antitrust Division
1401 H Street, N.W., Suite 4000
Washington, D.C. 20530
(202) 353-4211

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>UNITEDHEALTH GROUP<br>INCORPORATED and<br>SIERRA HEALTH SERVICES, INC.,<br><br>        Defendants. | Civil No.<br><br>Filed: |

## **HOLD SEPARATE AND ASSET PRESERVATION STIPULATION AND ORDER**

It is hereby stipulated and agreed by and between the undersigned parties, subject to approval and entry by the Court, that:

## I. **DEFINITIONS**

As used in this Asset Preservation Stipulation and Order ("Stipulation and Order"):

A.    "Acquirer" means the entity to whom the Divestiture Assets are Divested.

B.    "Clark County" means Clark County, Nevada.

C.    "Clark County CMS Plans" means the individual Medicare Advantage plans offered under CMS Plan Nos. H2949-002, H2949-009, and H2949-012, but does not include any Series 800 Medicare Advantage plans offered to retirees through commercial customers or contracts.

D.    "Clark and Nye County CMS Plans" means the Clark County CMS Plans and the Nye County CMS Plans.

E.      "CMS" means the Centers for Medicare and Medicaid Services, an agency within the U.S. Department of Health and Human Services.

F.      "Divestiture Assets" means all tangible and intangible assets dedicated to the administration, operation, selling, and marketing of the Clark and Nye County CMS Plans, including (1) all of United's rights and obligations under United's Medicare Contract No. H2949 with CMS relating to the Clark and Nye County CMS Plans, including the right to offer the Medicare Advantage plan to individual enrollees pursuant to the bids and Evidence of Coverage filed with CMS in 2007 for the 2008 contract year, and the right to receive from CMS a per member per month capitation payment in exchange for providing or arranging for the benefits enumerated in the bids and Evidence of Coverage, and (2) copies of all business, financial and operational books, records, and data, both current and historical, that relate to the Clark County CMS Plans or the Nye County CMS Plans. Where books, records, or data relate to the Clark County CMS Plans or the Nye County CMS Plans, but not solely to these Plans, United shall provide excerpts relating to these Plans. Nothing herein requires United to take any action prohibited by the Health Insurance Portability and Accountability Act of 1996 (HIPAA).

G.      "Evidence of Coverage" means the document that outlines an enrollee's benefits and exclusions under a Medicare Advantage Plan.

H.      "Las Vegas Area" means Clark County and Nye County.

I.      "Medicare Advantage Line of Business" means the operations of United that implement and administer the Clark and Nye County CMS Plans.

J.      "Medicare Advantage Plan" means Medicare Advantage health maintenance

2

organization plans, Medicare Advantage preferred provider organization plans, and Medicare

Advantage private fee-for-service plans, as defined by 42 U.S.C. § 1395w-21(a)(2).

    K.    "Nye County" means Nye County, Nevada.

    L.    "Nye County CMS Plans" means the individual Medicare Advantage plans

offered under CMS Plan Nos. H2949-007 and H2949-011, but does not include any Series 800

Medicare Advantage plans offered to retirees through commercial customers or contracts.

    M.    "Sierra" means Defendant Sierra Health Services, Inc., a Nevada corporation with

its headquarters in Las Vegas, Nevada, its successors and assigns, and its subsidiaries, divisions,

groups, affiliates, partnerships and joint ventures, and their respective directors, officers,

managers, agents, and employees.

    N.    "Transaction" means the merger contemplated by the Agreement and Plan of

Merger dated as of March 11, 2007, by and among United, Sapphire Acquisition, Inc. and Sierra.

    O.    "United" means Defendant UnitedHealth Group Incorporated, a Minnesota

corporation with its headquarters in Minnetonka, Minnesota, its successors and assigns, and its

subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their respective

directors, officers, managers, agents, and employees.

## II. <u>OBJECTIVES</u>

The proposed Final Judgment filed in this case is meant to ensure Defendants' prompt

divestiture of the Divestiture Assets for the purpose of preserving viable competition in the sale

of Medicare Advantage Plans in Clark and Nye Counties in order to remedy the effects that the

United States alleges would otherwise result from United's acquisition of Sierra.  This

Stipulation and Order ensures that until the divestiture required by the proposed Final Judgment

has been accomplished, the Divestiture Assets remain as economically viable, competitive, and

ongoing business concerns; that competition is maintained during the pendancy of the ordered

divestitures; and that the Divestiture Assets will be preserved and maintained. This Stipulation

and Order also ensures that Sierra remains an independent, economically viable, and ongoing

business concern and that competition is maintained between United and Sierra until the

divestiture of the Divestiture Assets under the proposed Final Judgment is accomplished.

### III. JURISDICTION AND VENUE

The Court has jurisdiction over the subject matter of this action and over each of the

parties hereto, and venue of this action is proper in the United States District Court for the

District of Columbia. The complaint states a claim upon which relief may be granted against

Defendants under Section 7 of the Clayton Act, 15 U.S.C. § 18.

### IV. COMPLIANCE WITH AND ENTRY OF THE PROPOSED FINAL JUDGMENT

A.    The parties stipulate that the proposed Final Judgment may be filed with this Court

by the United States and may be entered by the Court, upon the motion of any party or upon the

Court's own motion, at any time after compliance with the requirements of the Antitrust

Procedures and Penalties Act, 15 U.S.C. § 16, and without further notice to any party or other

proceedings, provided that the United States has not withdrawn its consent, which it may do at

any time before the entry of the proposed Final Judgment by serving notice thereof on the

Defendants and by filing that notice with the Court.

B.    Defendants shall abide by and comply with the provisions of the proposed Final

4

Judgment pending its entry by the Court, or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment, and shall, from the date of the signing of this Stipulation and Order by the parties, comply with all the terms and provisions of the proposed Final Judgment as though the same were in full force and effect as an order of the Court.

C.    Defendants shall not consummate the transaction sought to be enjoined by the Complaint herein before the Court has signed this Stipulation and Order.

D.    This Stipulation and Order shall apply with equal force and effect to any amended proposed Final Judgment agreed upon in writing by the parties and submitted to the Court.

E.    In the event: (1) the United States has withdrawn its consent, as provided in Section IV(A) above, or (2) the proposed Final Judgment is not entered pursuant to this Stipulation and Order, the time has expired for all appeals of any Court ruling declining entry of the proposed Final Judgment, and the Court has not otherwise ordered continued compliance with the terms and provisions of the proposed Final Judgment, then the parties are released from all further obligations under this Stipulation and Order, and the making of this Stipulation and Order shall be without prejudice to any party in this or any other proceeding.

F.    Defendants represent that the divestitures ordered in the proposed Final Judgment can and will be made, and that Defendants will later raise no claim of mistake, hardship or difficulty of compliance as grounds for asking the Court to modify any of the provisions contained therein.

## V. HOLD SEPARATE AND PRESERVATION OF SIERRA

For the duration of the period specified in Section VII:

A.    Defendant Sierra shall operate as an independent, ongoing, economically viable competitive business held separate, distinct and apart from Defendant United's operations. Within twenty (20) days after the entry of the Stipulation and Order, Defendants will inform the United States and any Monitoring Trustee of the steps they have taken to comply with this Stipulation and Order.

B.    Defendants shall not coordinate any aspect of their commercial operations, including the marketing or sales of any products.  Defendant United may ensure that Sierra complies with United's policies and procedures relating to compliance with environmental, health, safety, human resource, and securities or other laws and regulations.  Other than as excepted above, Defendants shall take all steps necessary to ensure that:

(1)    United does not attempt to influence, direct, or control the management of Sierra with regard to any aspect of its competitive operations; and

(2)    the management of Sierra acts to maintain and increase its sales and revenues, and maintain operational, promotional, advertising, sales, technical, customer-service, and marketing support at previously approved levels for 2008.

C.    Defendants shall take all steps necessary to ensure that Sierra will be maintained and operated as an ongoing, economically viable and active competitor in the marketing and sale of Medicare Advantage and commercial health plans.

6

D.     Defendant United shall not, except as approved by the United States, remove, sell, lease, assign, transfer, destroy, pledge or otherwise dispose of any asset of Sierra outside the ordinary course of business.

E.     Other than for cause, Defendants shall not transfer or terminate, or alter to the detriment of any employee, any current employment or salary agreements for any Sierra employee who on the date of entry of this Stipulation and Order works for Sierra; provided, however, that this Section V(E) does not prohibit any employment agreement between United and any Sierra employee that is entered into prior to the date of this Stipulation and Order and that becomes effective upon consummation of the Transaction.

F.     Defendants shall maintain, in accordance with sound accounting principles, separate, accurate and complete financial ledgers, books and records that report on a periodic basis, such as the last business day of every month, consistent with past practices, the assets, liabilities, expenses, revenues and income of Sierra.

## VI. HOLD SEPARATE AND PRESERVATION OF THE DIVESTITURE ASSETS

For the duration of the period specified in Section VII:

A.     Defendants shall preserve, maintain, and continue to operate the Divestiture Assets and permit expeditious divestiture in a manner consistent with this Stipulation and Order and the proposed Final Judgment.

B.     Defendants shall take all steps necessary to preserve and maintain the value and goodwill of the Medicare Advantage Line of Business, and continue to operate the Medicare Advantage Line of Business as an economically viable, competitive, and ongoing line of

7

business.

C.      Defendant United shall provide sufficient working capital and lines and sources of

credit to continue to maintain the Medicare Advantage Line of Business as an economically

viable, competitive, and ongoing line of business.

D.      Defendants shall not, except as part of a divestiture approved by the United States

in accordance with the proposed Final Judgment, remove, sell, lease, assign, transfer, destroy,

pledge, or otherwise dispose of any of the Divestiture Assets.

E.      United's employees whose duties are primarily related to the operation of the

Divestiture Assets shall not be terminated or reassigned to other areas within the company except

for transfer bids initiated by employees pursuant to United's regular, established job posting

policy. Defendants shall provide the United States and any Monitoring Trustee with ten (10)

calendar days notice of such transfer.

F.      Defendants shall take no action that would jeopardize, delay, or impede the sale of

the Divestiture Assets to an Acquirer acceptable to the United States in its sole discretion.

G.      Defendants shall use all reasonable efforts to maintain and increase the sales and

revenues of the Medicare Advantage Line of Business, and shall maintain at previously approved

levels for 2008, all operational, promotional, advertising, sales, technical, customer-service and

marketing support for the Medicare Advantage Line of Business.

H.      Defendants shall provide such support services for the Medicare Advantage Line

of Business as are required for the Medicare Advantage Line of Business to operate as an

economically viable, competitive, and ongoing line of business. These services may include

8

federal and state regulatory compliance, including making all customary filings with CMS and other federal and state governmental units; human resources; legal; finance; actuarial; claims processing; software and computer operations support; eligibility, enrollment; utilization management and administrative and such other services as are reasonably necessary to operate the Medicare Advantage Line of Business.

I.    Defendants shall preserve the existing relationships of each provider, customer, and other entity or individual having business relations relating to the Medicare Advantage Line of Business, in accordance with current practice.

J.    Defendants shall maintain, in accordance with sound accounting principles, accurate and complete books and records that report on a periodic basis, such as the last business day of every month, consistent with past practices, the expenses, revenues, and income attributable to the Divestiture Assets.

K.    If Defendants fail to divest the Divestiture Assets by May 15, 2008, at the discretion of the United States, United shall be required to submit all necessary filings to CMS to ensure that the Divestiture Assets remain a viable, ongoing business, consisting of the same Medicare Advantage Plans that United offered in 2008 with comparable benefits and premiums.

L.    Subject to the approval of the United States, Defendants shall appoint a person or persons to oversee the Divestiture Assets. This person shall be responsible for ensuring Defendants' compliance with this section, and shall have complete managerial responsibility for the Divestiture Assets, subject to the provisions of this Final Judgment. In the event such person is unable to perform his duties, Defendants shall appoint, subject to the approval of the United

States, a replacement within ten (10) working days. Should Defendants fail to appoint a

replacement acceptable to the United States within this time period, the United States shall

appoint a replacement.

     M.     Defendants shall take no action that would interfere with the ability of any trustee

appointed pursuant to the proposed Final Judgment to complete the divestitures pursuant to the

proposed Final Judgment to an Acquirer acceptable to the United States.

## VII. CONTINUATION OF HOLD SEPARATE AND ASSET PRESERVATION STIPULATION AND ORDER

     This Stipulation and Order shall remain in effect until consummation of the Divestiture

required by the proposed Final Judgment or until further order of the Court.

Dated: February 25, 2008

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA

_Peter J. Mucchetti_
Peter J. Mucchetti (D.C. Bar # 463202)
United States Department of Justice
Antitrust Division, Litigation I Section
1401 H Street, NW - Suite 4000
Washington, DC 20530

FOR DEFENDANT
UNITEDHEALTH GROUP INCORPORATED

_Robert E. Bloch_
Robert E. Bloch (D.C. Bar # 175927)
Mayer Brown LLP
1909 K Street N.W.
Washington, DC 20006


DEFENDANT SIERRA HEALTH SERVICES,
INC.:

_____
Arthur N. Lerner (D.C. Bar # 311449)
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595

States, a replacement within ten (10) working days. Should Defendants fail to appoint a

replacement acceptable to the United States within this time period, the United States shall

appoint a replacement.

      M.     Defendants shall take no action that would interfere with the ability of any trustee

appointed pursuant to the proposed Final Judgment to complete the divestitures pursuant to the

proposed Final Judgment to an Acquirer acceptable to the United States.

## VII. CONTINUATION OF HOLD SEPARATE AND ASSET PRESERVATION STIPULATION AND ORDER

      This Stipulation and Order shall remain in effect until consummation of the Divestiture

required by the proposed Final Judgment or until further order of the Court.

Dated: February __, 2008

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA

FOR DEFENDANT
UNITEDHEALTH GROUP INCORPORATED

_____

Peter J. Mucchetti (D.C. Bar # 463202)
United States Department of Justice
Antitrust Division, Litigation I Section
1401 H Street, NW - Suite 4000
Washington, DC 20530

_____

Robert E. Bloch (D.C. Bar # 175927)
Mayer Brown LLP
1909 K Street N.W.
Washington, DC 20006

DEFENDANT SIERRA HEALTH SERVICES,
INC.:

_____

Arthur N. Lerner (D.C. Bar # 311449)
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595

10

## ORDER

**IT IS SO ORDERED** by the Court, this _____ day of _____, _____ .

_____

**United States District Judge**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. |
| | ) | |
| v. | ) | Judge |
| | ) | |
| UNITEDHEALTH GROUP | ) | Filed: |
| INCORPORATED and | ) | |
| SIERRA HEALTH SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## FINAL JUDGMENT

WHEREAS, plaintiff, United States of America, filed its Complaint on February 25, 2008, and the United States and Defendant UnitedHealth Group Incorporated and Defendant Sierra Health Services, Inc., by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, Defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights and assets by Defendants to ensure that competition is not substantially lessened in the sale of Medicare Advantage Plans to senior citizens and others in the Las Vegas, Nevada area;

AND WHEREAS, the United States requires Defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, Defendants have represented to the United States that the divestiture required by this Final Judgment can and will be made, and that Defendants will not later raise any claim of hardship or difficulty as grounds for asking the Court to modify any of the provisions of this Final Judgment;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED, AND DECREED:

## I.    **JURISDICTION**

This Court has jurisdiction over the subject matter of, and each of the parties to, this action. The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

## II.    **DEFINITIONS**

As used in this Final Judgment:

A.    "Acquirer" means the entity to whom the Divestiture Assets are divested.

B.    "Clark County" means Clark County, Nevada.

C.    "Clark County CMS Plans" means the individual Medicare Advantage plans offered under CMS Plan Nos. H2949-002, H2949-009, and H2949-012, but does not include any Series 800 Medicare Advantage plans offered to retirees through commercial customers or contracts.

2

D.    "Clark and Nye County CMS Plans" means the Clark County CMS Plans and the Nye County CMS Plans.

E.    "CMS" means the Centers for Medicare and Medicaid Services, an agency within the U.S. Department of Health and Human Services.

F.    "Divestiture Assets" means all tangible and intangible assets dedicated to the administration, operation, selling, and marketing of the Clark and Nye County CMS Plans, including (1) all of United's rights and obligations under United's Medicare Contract No. H2949 with CMS relating to the Clark and Nye County CMS Plans, including the right to offer the Medicare Advantage plan to individual enrollees pursuant to the bids and Evidence of Coverage filed with CMS in 2007 for the 2008 contract year, and the right to receive from CMS a per member per month capitation payment in exchange for providing or arranging for the benefits enumerated in the bids and Evidence of Coverage, and (2) copies of all business, financial and operational books, records, and data, both current and historical, that relate to the Clark County CMS Plans or the Nye County CMS Plans.  Where books, records, or data relate to the Clark County CMS Plans or the Nye County CMS Plans, but not solely to these Plans, United shall provide excerpts relating to these Plans.  Nothing herein requires United to take any action prohibited by the Health Insurance Portability and Accountability Act of 1996 (HIPAA).

G.    "Evidence of Coverage" means the document that outlines an enrollee's benefits and exclusions under a Medicare Advantage Plan.

H.    "HealthCare Partners" means JSA Healthcare Nevada, LLC, a Nevada limited liability company, and its affiliated entities, including HealthCare Partners, LLC and Summit Medical Group.

3

I.    "Humana" means Humana Inc., a Delaware corporation with its headquarters in Louisville, Kentucky.

J.    "Las Vegas Area" means Clark County and Nye County.

K.    "Medicare Advantage Line of Business" means the operations of United that implement and administer the Clark and Nye County CMS Plans.

L.    "Medicare Advantage Plan" means Medicare Advantage health maintenance organization plans, Medicare Advantage preferred provider organization plans, and Medicare Advantage private fee-for-service plans, as defined by 42 U.S.C. § 1395w-21(a)(2).

M.    "Nye County" means Nye County, Nevada.

N.    "Nye County CMS Plans" means the individual Medicare Advantage plans offered under CMS Plan Nos. H2949-007 and H2949-011, but does not include any Series 800 Medicare Advantage plans offered to retirees through commercial customers or contracts.

O.    "PIPA" means The Physicians IPA, Inc., a Nevada non-profit corporation based in Las Vegas, Nevada.

P.    "Provider Network" means all health care providers, including physicians, hospitals, ancillary service providers, and other health care providers with which United contracts for the provision of covered medical services for United's Medicare Advantage Plans in the Las Vegas area.

Q.    "Sierra" means Defendant Sierra Health Services, Inc., a Nevada corporation with its headquarters in Las Vegas, Nevada, its successors and assigns, and

4

its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their respective directors, officers, managers, agents, and employees.

R.    "Transaction" means the merger contemplated by the Agreement and Plan of Merger dated as of March 11, 2007, by and among United, Sapphire Acquisition, Inc. and Sierra.

S.    "United" means Defendant UnitedHealth Group Incorporated, a Minnesota corporation with its headquarters in Minnetonka, Minnesota, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and their respective directors, officers, managers, agents, and employees.

## III.  APPLICABILITY

A.    This Final Judgment applies to United and Sierra, and to all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B.    If, prior to complying with Section IV and VI of this Final Judgment, Defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business units that include the Divestiture Assets, they shall require the purchaser to be bound by the provisions of this Final Judgment.  Defendants need not obtain such an agreement from the Acquirer of the assets divested pursuant to this Final Judgment.

## IV.  DIVESTITURE OF THE DIVESTITURE ASSETS

A.    Defendants are ordered, within forty-five (45) calendar days after the filing of the Complaint in this matter, to divest the Divestiture Assets in a manner consistent with this Final Judgment to an Acquirer acceptable to the United States in its sole discretion and on terms acceptable to the United States in its sole discretion,

5

including any agreement for transitional support services entered into pursuant to Section IV(J) of this Final Judgment. The United States, in its sole discretion, may grant one or more extensions of this time period, not to exceed sixty (60) calendar days in total, and shall notify the Court in each such circumstance. Defendants shall accomplish the divestiture of the Divestiture Assets as expeditiously as possible and in such a manner as will allow the Acquirer to be a viable, ongoing business engaged in the sale of Medicare Advantage Plans in the Las Vegas Area.

      B.      If applications for approval have been filed with CMS and the appropriate other governmental units within twenty (20) calendar days after the filing of the Complaint in this matter, but these required approvals have not been issued before the end of the period permitted for Divestiture in Section IV(A), the United States may extend the period for Divestiture until five (5) business days after all necessary government approvals have been received.

      C.      The Divestiture shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divestiture Assets can and will be used by the Acquirer as part of a viable, ongoing business engaged in the sale of Medicare Advantage Plans in the Las Vegas Area. Defendants must demonstrate to the sole satisfaction of the United States that the Divestiture will remedy the competitive harm alleged in the Complaint. The Divestiture shall be:

      (1)      made to an Acquirer that, in the United States's sole judgment, has the intent and capability (including the necessary managerial, operational, technical, and financial capability) to compete effectively in the sale of Medicare Advantage Plans in the Las Vegas Area; and

6

(2)    accomplished so as to satisfy the United States, in its sole

discretion, that none of the terms of any agreement between Defendants and the Acquirer

gives Defendants the ability unreasonably to raise the Acquirer's costs, to lower the

Acquirer's efficiency, or otherwise to interfere with the Acquirer's ability to compete

effectively.

D.    Defendants shall not take any action that will impede in any way the

permitting, operation, or divestiture of the Divestiture Assets.

E.    Defendants shall provide to the Acquirer, the United States, and any

Monitoring Trustee, information relating to the personnel primarily involved in the

operation of the Divestiture Assets to enable the Acquirer to make offers of employment

to those persons.  Defendants shall not interfere with any negotiations by the Acquirer to

employ any of those persons.  For a period of two (2) years from the filing of the

Complaint in this matter, Defendants shall not hire or solicit to hire any such person who

was hired by the Acquirer, unless the Acquirer has notified such person that the Acquirer

does not intend to continue to employ the person.

F.    Defendants shall assist the negotiation of and entry into agreement(s)

between the Acquirer and HealthCare Partners that will allow members of the Clark and

Nye County CMS Plans to have continued access to substantially all of United's Provider

Network as of January 2008 on terms no less favorable than United's agreements as of

January 2008.

G.    Upon completing the Divestiture and through March 31, 2010, Defendants

shall have no agreements with HealthCare Partners or PIPA that provide for access by

7

United to HealthCare Partners or PIPA in connection with enrollees in any type of individual Medicare Advantage plan of Defendants in the Las Vegas Area.

H.    Upon completing the Divestiture and through March 31, 2009, Defendants shall not use the AARP brand, or any other substantially similar brand, name, or logo, for any type of individual Medicare Advantage plan of Defendants in the Las Vegas Area. Upon completing the Divestiture and through March 31, 2010, Defendants shall not use the SecureHorizons brand, or any other substantially similar brand, name, or logo, for any type of individual Medicare Advantage plan of Defendants in the Las Vegas Area.

I.    At the Acquirer's option, and subject to approval by the United States, Defendants will allow the Acquirer to license and use the SecureHorizons brand, and any other substantially similar brand, name, or logo, with the Divestiture Assets for twelve months upon completing the Divestiture.

J.    At the Acquirer's option, and subject to approval by the United States, Defendants will provide transitional support services for medical claims processing, appeals and grievances, call-center support, enrollment and eligibility services, access to form templates, pharmacy services, disease management, Medicare risk-adjustment services, quality-assurance services, and such other transition services that are reasonably necessary for the Acquirer to operate the Divestiture Assets. Defendants shall not provide such transitional support services for more than twelve months from the date of the completion of the Divestiture unless the United States shall otherwise approve.

K.    To ensure an effective transition and transfer of enrollees in the Clark and Nye County CMS Plans to the Acquirer, Defendants shall cooperate and work with the Acquirer in transition planning and implementing the transfer of the Divestiture Assets.

8

L.      Defendants will communicate and cooperate fully with the Acquirer to promptly identify and obtain all consents of government agencies necessary to divest the Divestiture Assets.

M.      Defendants will communicate and cooperate fully with the Acquirer to work in good faith with CMS to select a novation process that is efficient and minimizes any potential disruption and confusion to enrollees in the Clark and Nye County CMS Plans.

N.      United shall warrant to the Acquirer that, since January 1, 2007, United has operated the Divestiture Assets in all material respects in the ordinary course of business consistent with past practices except for the global capitation agreement that United entered into with HealthCare Partners effective January 1, 2008. United shall also warrant that there has not been (a) any material loss or change with respect to the Divestiture Assets; (b) any event, circumstance, development, or change that has had a material adverse effect on the Divestiture Assets; or (c) any change by United of its accounting or actuarial methods, principles, or practices that is relevant to the Divestiture Assets.

O.      Defendants shall comply with all laws applicable to the Divestiture Assets.

P.      Defendants shall not take any action having the effect of delaying the authorization or scheduling of health care services provided to enrollees in the Clark and Nye County CMS Plans in a manner inconsistent with Defendants' past practice with respect to the Clark and Nye County CMS Plans.

Q.      Defendants shall not make any material change to the customary terms and conditions upon which it does business with respect to the Medicare Advantage Line

of Business that would be expected, individually or in the aggregate, to have a materially adverse effect on the Medicare Advantage Line of Business.

R.     United shall identify its top ten independent insurance agents, general agents, producers, and brokers (collectively, "Brokers") that have entered into a Broker contract with respect to the Medicare Advantage Line of Business along with the corresponding number of enrollees produced by each such Broker. United will introduce the Acquirer to any such Broker for the purpose of the Acquirer having an opportunity, at the Acquirer's option, to negotiate an agreement with the Broker to market and sell the Clark and Nye County CMS Plans after the completion of the Divestiture.

S.     Defendants shall first attempt to sell the Divestiture Assets to Humana.

T.     If Defendants fail to divest the Divestiture Assets by May 15, 2008, at the discretion of the United States, United shall be required to submit all necessary filings to CMS to ensure that the Divestiture Assets remain a viable, ongoing business, offering the same Medicare Advantage Plans that United offered in 2008 with comparable benefits and premiums.

## V.    **APPOINTMENT OF MONITORING TRUSTEE**

A.     Upon the filing of this Final Judgment, the United States may, in its sole discretion, appoint a Monitoring Trustee, subject to approval by the Court.

B.     The Monitoring Trustee shall have the power and authority to monitor Defendants' compliance with the terms of this Final Judgment and the Hold Separate and Asset Preservation Stipulation and Order entered by this Court and shall have such powers as this Court deems appropriate. Subject to Section V(D) of this Final Judgment, the Monitoring Trustee may hire at the cost and expense of United any consultants,

10

accountants, attorneys, or other persons, who shall be solely accountable to the Monitoring Trustee, reasonably necessary in the Monitoring Trustee's judgment.

C.      Defendants shall not object to actions taken by the Monitoring Trustee in fulfillment of the Monitoring Trustee's responsibilities under any Order of this Court on any ground other than the Monitoring Trustee's malfeasance. Any such objections by Defendants must be conveyed in writing to the United States and the Monitoring Trustee within ten (10) calendar days after the action taken by the Monitoring Trustee giving rise to the Defendants' objection.

D.      The Monitoring Trustee shall serve at the cost and expense of United, on such terms and conditions as the United States approves. The compensation of the Monitoring Trustee and any consultants, accountants, attorneys, and other persons retained by the Monitoring Trustee shall be on reasonable and customary terms commensurate with the individuals' experience and responsibilities.

E.      The Monitoring Trustee shall have no responsibility or obligation for the operation of Defendants' businesses.

F.      Defendants shall assist the Monitoring Trustee in monitoring Defendants' compliance with their individual obligations under this Final Judgment and under the Hold Separate and Asset Preservation Stipulation and Order. The Monitoring Trustee and any consultants, accountants, attorneys, and other persons retained by the Monitoring Trustee shall have full and complete access to the personnel, books, records, and facilities relating to the Divestiture Assets, subject to reasonable protection for trade secret or other confidential research, development, or commercial information or any applicable

11

privileges.  Defendants shall take no action to interfere with or to impede the Monitoring Trustee's accomplishment of its responsibilities.

G.    After its appointment, the Monitoring Trustee shall file monthly reports with the United States and the Court setting forth the Defendants' efforts to comply with their individual obligations under this Final Judgment and under the Hold Separate and Asset Preservation Stipulation and Order.  To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court.

H.    The Monitoring Trustee shall serve until the divestiture of all the Divestiture Assets is finalized pursuant to either Section IV or Section VI of this Final Judgment and any agreement(s) for transitional support services described in Section IV(J) herein have expired.

## VI.  **APPOINTMENT OF TRUSTEE**

A.    If Defendants have not divested the Divestiture Assets within the time period specified in Section IV(A), Defendants shall notify the United States of that fact in writing.  Upon application of the United States, the Court shall appoint a trustee selected by the United States and approved by the Court to effect the divestiture of the Divestiture Assets.

B.    After the appointment of a trustee becomes effective, only the trustee shall have the right to sell the Divestiture Assets.  The trustee shall have the power and authority to accomplish the divestiture to an Acquirer acceptable to the United States at such price and on such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions of Sections IV, VI, and VII of this Final Judgment, and shall

12

have such other powers as this Court deems appropriate. Subject to Section VI(D) of this Final Judgment, the trustee may hire at the cost and expense of Defendants any investment bankers, attorneys, or other agents, who shall be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the divestiture.

C.    Defendants shall not object to a sale by the trustee on any ground other than the trustee's malfeasance. Any such objections by Defendants must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VII.

D.    The trustee shall serve at the cost and expense of Defendants, on such terms and conditions as the United States approves, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to Defendants and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

E.    Defendants shall assist the trustee in accomplishing the required divestiture. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities relating to the Divestiture Assets, and Defendants shall develop financial and other information relevant to such business as the trustee may reasonably

request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information. Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestiture.

F.    After its appointment, the trustee shall file monthly reports with the United States and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this Final Judgment. To the extent that such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Divestiture Assets.

G.    If the trustee has not accomplished the divestiture ordered under this Final Judgment within six months after its appointment, the trustee shall promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestiture, (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished, and (3) the trustee's recommendations. To the extent that such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States which shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if

14

necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

## VII. <u>NOTICE OF PROPOSED DIVESTITURE</u>

A.      Within two (2) business days following execution of a definitive divestiture agreement, Defendants or the trustee, whichever is then responsible for effecting the divestiture required herein, shall notify the United States and any Monitoring Trustee of any proposed divestiture required by Section IV or VI of this Final Judgment. If the trustee is responsible, it shall similarly notify Defendants. The notice shall set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divestiture Assets, together with full details of the same.

B.      Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from Defendants, the proposed Acquirer, any other third party, or the trustee, if applicable, additional information concerning the proposed divestiture, the proposed Acquirer, and any other potential Acquirer. Defendants and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C.      Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States has been provided the additional information requested from Defendants, the proposed Acquirer, any third party, and the trustee, whichever is later, the United States shall provide written notice to Defendants and the trustee, if there is one, stating whether or not it objects to the proposed divestiture. If the

United States provides written notice that it does not object, the divestiture may be consummated, subject only to Defendants' limited right to object to the sale under Section VI(C) of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer or upon objection by the United States, a divestiture proposed under Section IV or Section VI shall not be consummated. Upon objection by Defendants under Section VI(C), a divestiture proposed under Section VI shall not be consummated unless approved by the Court.

## VIII.    FINANCING

Defendants shall not finance all or any part of any Purchase made pursuant to Section IV or VI of this Final Judgment.

## IX.    HOLD SEPARATE AND PRESERVATION OF ASSETS

Until the divestiture required by this Final Judgment has been accomplished, Defendants shall take all steps necessary to comply with the Hold Separate and Asset Preservation Stipulation and Order entered by this Court. Defendants shall take no action that will jeopardize any divestiture ordered by this Court.

## X.    AFFIDAVITS AND RECORDS

A.       Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestiture has been completed under Section IV or VI, Defendants shall deliver to the United States and any Monitoring Trustee an affidavit as to the fact and manner of its compliance with Section IV or VI of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to

acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts Defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to prospective Acquirers, including the limitations, if any, on such information. Assuming that the information set forth in the affidavit is true and complete, any objection by the United States to information provided by Defendants, including limitation on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B.      Within twenty (20) calendar days of the filing of the Complaint in this matter, Defendants shall deliver to the United States and any Monitoring Trustee an affidavit that describes in reasonable detail all actions that Defendants have taken and all steps that Defendants have implemented on an ongoing basis to comply with Section IX of this Final Judgment. Defendants shall deliver to the United States and any Monitoring Trustee an affidavit describing any changes to the efforts and actions outlined in Defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C.      Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestiture has been completed.

## XI.  COMPLIANCE INSPECTION

A.      For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time authorized

17

representatives of the United States Department of Justice, including persons retained by the United States, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to Defendants, be permitted:

      (1)     to access during Defendants' office hours to inspect and copy, or at the United States's option, to require that Defendants provide hard copy and electronic copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Defendants, relating to any matters contained in this Final Judgment; and

      (2)     to interview, either informally or on the record, Defendants' officers, employees, or agents, who may have their individual counsel present, regarding these matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

      B.     Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, Defendants shall submit written reports, or responses to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment.

      C.     No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, which includes CMS, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

18

D.      If at the time information or documents are furnished by Defendants to the United States, Defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United States shall give Defendants ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than grand jury proceedings).

## XII. <u>NO REACQUISITION</u>

Defendants may not reacquire any part of the Divestiture Assets during the term of this Final Judgment provided, however, that this Final Judgment shall not prohibit Defendants from offering individual Medicare Advantage Plans in the ordinary course of business otherwise in conformity with this Final Judgment.

## XIII.    <u>RETENTION OF JURISDICTION</u>

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIV. <u>EXPIRATION OF FINAL JUDGMENT</u>

Unless this Court grants an extension, this Final Judgment shall expire ten (10) years from the date of its entry.

## XV.  <u>PUBLIC INTEREST DETERMINATION</u>

Entry of this Final Judgment is in the public interest.  The parties have complied

with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16,

including making copies available to the public of this Final Judgment, the Competitive

Impact Statement, and any comments thereon and the United States's responses to

comments.  Based upon the record before the Court, which includes the Competitive

Impact Statement and any comments and response to comments filed with the Court,

entry of this Final Judgment is in the public interest.


                              Court approval subject to procedures of Antitrust
                              Procedures and Penalties Act, 15 U.S.C. § 16



_____          _____
Date                              United States District Judge

20