UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) Civil No. |
| | ) |
| v. | ) Judge: |
| | ) |
| UNITEDHEALTH GROUP | ) Filed: |
| INCORPORATED and | ) |
| SIERRA HEALTH SERVICES, INC., | ) |
| | ) |
| Defendants. | ) |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the

Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files

this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in

this civil antitrust proceeding.

## I. NATURE AND PURPOSE OF THE PROCEEDING

Defendants entered into an Agreement and Plan of Merger dated March 11, 2007,

whereby UnitedHealth Group, Inc. ("United") agreed to acquire all outstanding shares of Sierra

Health Services, Inc. ("Sierra"). The United States filed a civil antitrust Complaint on February

25, 2008 seeking to enjoin the proposed acquisition. The Complaint alleges that the proposed

acquisition likely will substantially lessen competition in the sale of Medicare Advantage plans

in Clark and Nye Counties, Nevada ("the Las Vegas area"), in violation of Section 7 of the

Clayton Act ("Section 7"), 15 U.S.C. § 18. As defined by federal law, Medicare Advantage

plans consist of Medicare Advantage health maintenance organization ("MA-HMO") plans, Medicare Advantage preferred provider organization ("MA-PPO") plans, and Medicare Advantage Private Fee-for-Service ("MA-PFFS") plans. *See* 42 U.S.C. § 1395w-21(a)(2).

When the Complaint was filed, the United States also filed a Hold Separate and Asset Preservation Stipulation and Order ("Hold Separate Order") and proposed Final Judgment. The proposed Final Judgment, which is explained more fully below, would permit United to complete its acquisition of Sierra but would require the divestiture of certain assets (the "Divestiture Assets") relating to United's Medicare Advantage line of business in the Las Vegas area and injunctive relief sufficient to preserve competition in the sale of Medicare Advantage plans in the Las Vegas area.

Until the divestiture of the Divestiture Assets has been accomplished, the Hold Separate Order requires Defendants to take all steps necessary to preserve the Divestiture Assets and ensure that Sierra operates as an independent, ongoing, economically viable, competitive business held entirely separate, distinct and apart from United's other operations. Further, until the divestiture of the Divestiture Assets, Defendants must take all steps necessary to ensure that United's Medicare Advantage line of business in Las Vegas will be maintained and operated as an ongoing, economically viable and active line of business; that competition between United and Sierra in the sale of Medicare Advantage plans in the Las Vegas area is maintained during the pendency of the ordered divestitures; and that Defendants preserve and maintain the Divestiture Assets associated with United's Medicare Advantage line of business in the Las Vegas area. The Hold Separate Order thus ensures that competition is protected pending

2

completion of the required divestitures and that the assets are preserved so that relief will be effective.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II. DESCRIPTION OF THE EVENTS
## GIVING RISE TO THE ALLEGED VIOLATIONS

### A.    The Defendants and the Proposed Transaction

United is a Minnesota corporation and has its principal place of business in Minnetonka, Minnesota. United is the largest health insurer in the United States, providing health insurance and other services to more than 70 million people nationwide. In 2007, United reported revenues of approximately $75 billion. United provides health insurance to approximately 27,800 Medicare Advantage enrollees in the Las Vegas area under the Secure Horizons and AARP brands.

United has a well-established managed-care network in the Las Vegas area that it uses to provide services to enrollees in Medicare Advantage plans. Health care services provided by HealthCare Partners, LLC ("HealthCare Partners"), The Physicians IPA, Inc., and Summit Medical Group are an integral part of this network.

Sierra is a Nevada corporation with its principal place of business in Las Vegas, Nevada. Sierra is the largest health insurer in Nevada, providing health insurance and other services to more than 655,000 people. In 2007, Sierra reported revenues of $1.9 billion. Sierra provides

health insurance to approximately 49,500 Medicare Advantage enrollees in the Las Vegas area. It sells Medicare Advantage HMO products under the Senior Dimensions brand. Sierra sells Medicare Advantage preferred provider organization ("PPO") plans under the Sierra Spectrum and Sierra Nevada Spectrum brands. Sierra also sells MA-PFFS plans under the Sierra Optima Select brand.

Sierra owns the largest medical group in Las Vegas, Southwest Medical Associates, Inc. ("SMA"), which employs approximately 250 physicians and other health care professionals. Sierra uses SMA to provide a substantial portion of the care delivered to Sierra's Medicare Advantage members, particularly HMO and PPO members.

On March 11, 2007, United and Sierra entered into an Agreement and Plan of Merger whereby United agreed to acquire all outstanding shares of Sierra. The transaction is valued at approximately $2.6 billion. The transaction would give United a 94 percent share of Medicare Advantage enrollees in the Las Vegas area.

**B.    The Relevant Product Market is No Broader Than the Sale of Medicare Advantage Health Insurance in the Las Vegas Area**

The Complaint alleges that United's proposed acquisition of Sierra is likely to substantially lessen competition in a market no broader than the sale of Medicare Advantage health insurance plans to senior citizens ("seniors") and other Medicare-eligible individuals in the Las Vegas area, in violation of Section 7 of the Clayton Act. Due in large part to the lower out-of-pocket costs and richer benefits that many Medicare Advantage plans offer seniors over traditional Medicare, seniors in the Las Vegas area would not likely switch away from Medicare

Advantage plans to traditional Medicare in sufficient numbers to make an anticompetitive price increase or reduction in quality unprofitable.

In a product market that consists of all Medicare Advantage plans, the parties have a combined market share of approximately 94 percent. In a product market of Medicare Advantage coordinated-care plans (MA-HMO and MA-PPO plans), the parties have a combined market share of approximately 99 percent.[1]

1.    Healthcare Options for Seniors

The federal government facilitates the provision of health insurance to millions of Medicare-eligible citizens through two types of programs: (1) government-provided traditional Medicare (also known as Original Medicare) and (2) privately-provided Medicare Advantage.

Under traditional Medicare, a beneficiary receives hospital coverage under Medicare Part A and can elect to receive coverage for physician and out-patient services under Part B. For Part A, the government charges no monthly premium if the beneficiary was in the workforce and paid Medicare taxes. For Part B, the government deducts a monthly premium (currently $96.40 for most beneficiaries) from beneficiaries' Social Security checks. In addition, beneficiaries must pay deductibles and/or co-insurance for doctor visits and hospital stays. If beneficiaries want to limit potentially catastrophic out-of-pocket costs, they need to purchase a separate Medicare Supplement plan. For prescription drug coverage, seniors enrolled in traditional Medicare must purchase Medicare Part D drug coverage for an additional premium.

---

[1] There may be a narrower product market that consists of Medicare Advantage coordinated-care plans, but the Division did not need to determine whether such a product market exists to conclude that the merger is likely to substantially lessen competition and to identify an appropriate remedy for the reduction in competition that otherwise would have resulted from the merger.

Medicare Advantage plans are offered by private insurance companies. In establishing the Medicare Advantage program, Congress intended that vigorous competition among private insurers would lead insurers to offer seniors richer and more affordable benefits, provide a wider array of health-insurance choices, and be responsive to the demands of seniors. In fact, most successful Medicare Advantage plans, including those in the Las Vegas area, offer substantially richer benefits at lower costs to enrollees than traditional Medicare.

      2.    CMS Regulation of Medicare Advantage Plans

An insurance company that seeks to offer a Medicare Advantage plan in a region must submit a bid to the Centers for Medicare and Medicaid Services ("CMS") for each Medicare Advantage plan that it intends to offer. The bid must provide the insurer's anticipated costs per member to cover the basic Medicare Part A and Part B benefits. Those costs, including an anticipated profit margin, are compared to a Medicare benchmark that reflects, in part, the government's likely cost of covering the beneficiaries. If the insurer's bid for Medicare benefits is lower than the benchmark, the Medicare program retains 25 percent of the savings and the insurer must use the other 75 percent to provide supplemental benefits or lower premiums to enrollees. Accordingly, the lower the insurer's projected costs, the more benefits seniors enrolled in the insurer's plan will have available to them.

CMS's role in approving bids for Medicare Advantage plans does not displace or reduce competition among participating health insurance companies. Rather, the structure of the Medicare Advantage program encourages insurers to compete against each other to attract Medicare beneficiaries by providing low prices and more benefits.

6

3.    Medicare Advantage Plans Provide Better Benefits than Traditional Medicare

As stated above, many Medicare Advantage plans, including the United and Sierra plans offered in the Las Vegas area, provide substantially richer benefits at lower costs to enrollees than traditional Medicare. They offer lower co-payments, lower co-insurance, caps on total yearly out-of-pocket costs, prescription drug coverage, vision coverage, health club memberships, and other benefits that traditional Medicare does not cover.

A sufficient number of seniors in the Las Vegas area would not switch away from Medicare Advantage plans to traditional Medicare in the event of a small but significant reduction in benefits under the plans, or a small but significant increase in price, to render the benefit decrease or price increase unprofitable. Accordingly, the sale of Medicare Advantage plans is a relevant product market and a line of commerce in the Las Vegas area under Section 7 of the Clayton Act.

**C.    The Las Vegas Area is a Relevant Geographic Market**

Medicare-eligible residents in the Las Vegas area (Clark and Nye Counties) may only enroll in Medicare Advantage plans that CMS approves for the county in which they live. Consequently, they could not turn to Medicare Advantage plans elsewhere in the United States. Because Medicare-eligible residents in the Las Vegas area cannot purchase substitute Medicare Advantage plans sold in other geographic areas, the Las Vegas area is a relevant geographic market within the meaning of Section 7 of the Clayton Act.

**D.    Anticompetitive Effects of the Proposed Transaction**

The relevant market is highly concentrated and would become significantly more concentrated as a result of the proposed acquisition. Sierra accounts for approximately 60

7

percent of Medicare Advantage enrollees in the Las Vegas area. United accounts for approximately 34 percent. If consummated without divestiture relief, the merger would give the merged company a 94 percent market share.

The acquisition of Sierra by United would eliminate substantial head-to-head competition between United and Sierra that for years has benefited thousands of seniors. United and Sierra have competed with each other to sell Medicare Advantage plans that provide seniors with substantially greater benefits than those available under traditional Medicare, saving seniors thousands of dollars in yearly health care costs. The proposed acquisition would end that competition, eliminating the pressure that these close competitors place on each other to maintain attractive benefits, lower prices, and high-quality health care.

United and Sierra have competed against each other for newly Medicare-eligible individuals, sought to attract members from each other, and worked to avoid losing members to each other, by offering plans with zero premiums, reducing co-payments, eliminating deductibles, improving drug coverage, offering desirable fitness benefits, and attempting to make their provider networks more attractive to potential members. They have monitored each other's benefits to stay competitive and have considered each other important competitors. After the acquisition, the combined United/Sierra would not have the same incentive to improve benefits of Medicare Advantage plans as the two separate companies do today, and likely would raise prices or reduce services.

Competition from existing competitors with small market shares that offer Medicare Advantage plans or new entrants would be unlikely to prevent anticompetitive effects. Such firms face substantial cost, reputation, and distribution disadvantages that would likely prevent

8

them from expanding membership sufficiently to prevent United from raising prices or reducing

services.

### III. EXPLANATION OF THE PROPOSED FINAL JUDGMENT

**A.    The Divestiture Assets**

The proposed Final Judgment is designed to eliminate the anticompetitive effects

identified in the Complaint by requiring United to divest its individual Medicare Advantage line

of business in the Las Vegas area to an acquirer approved by the United States and on terms

acceptable to the United States.  This line of business covers approximately 25,800 individual

Medicare Advantage beneficiaries.  As described in Section IV of the proposed Final Judgment,

United is required to divest all tangible and intangible assets dedicated to the administration,

operation, selling, and marketing of its Medicare Advantage plans to individuals in the Las Vegas

area ("the Divestiture Assets"), including all of United's rights and obligations under the relevant

United contracts with CMS.  The divestiture, as contemplated in the proposed Final Judgment, is

designed to allow the acquirer of the assets to offer uninterrupted care to subscribers of United's

divested Medicare Advantage plans, including the ability of subscribers to continue to see the

same health care professionals available to them under the United Medicare Advantage plans.

The Divestiture Assets do not include assets relating to approximately 1,800 group

enrollees who enrolled in a Medicare Advantage plan through an employer or other group.  The

United States concluded that divesting these assets was not necessary to eliminate the

transaction's anticompetitive effects and could be disruptive to those beneficiaries.

The divestiture eliminates the anticompetitive effects of the merger by requiring United to

divest all of its individual Medicare Advantage business in the Las Vegas area to an acquirer that

9

can compete vigorously with the merged United-Sierra. The divestiture must be accomplished by selling or conveying the Divestiture Assets to an acquirer that, in the sole discretion of the United States, will be a viable, ongoing competitor in the Las Vegas area Medicare Advantage market. The divestiture shall be (i) made to an acquirer that has the intent and capability (including the necessary managerial, operational, technical, and financial capability) to compete effectively in the sale of Medicare Advantage products, and (ii) accomplished so as to satisfy the United States that none of the terms of any agreement between United and any acquirer gives United the ability to interfere with the acquirer's ability to compete effectively.

**B.    Selected Provisions of the Proposed Final Judgment**

In antitrust cases involving mergers in which the United States seeks a divestiture remedy, it requires completion of the divestiture within the shortest time period reasonable under the circumstances. A quick divestiture has the benefits of restoring competition lost in the acquisition and reducing the possibility of dissipation of the value of the assets. Section IV(A) of the proposed Final Judgment requires Defendants to divest the Divestiture Assets as a viable, ongoing business within 45 days after the filing of the Complaint.[2]

United has proposed to sell the Divestiture Assets to Humana Inc., and the United States has tentatively approved of Humana as the acquirer. Consequently, Section IV(S) of the proposed Final Judgment requires United first to attempt to sell the Divestiture Assets to Humana.

---

[2] Section IV(A) of the proposed Final Judgment provides that the United States, in its sole discretion, may grant one of more extensions to the 45-day period, not to exceed sixty calender days in total. The United States will notify the Court if such an extension is granted.

Other provisions of the proposed Final Judgment require Defendants to take several steps to enable the acquirer to provide prompt and effective competition in the Medicare Advantage market. Section IV(F) requires that Defendants assist the acquirer of the Divestiture Assets to enter into an agreement with HealthCare Partners that will allow members of United's Medicare Advantage plans to have continued access to substantially all of United's provider network of physicians, hospitals, ancillary service providers, and other health care providers on terms no less favorable than United's agreement with HealthCare Partners. Section IV(J) also requires that, at the acquirer's option, and subject to approval by the United States, Defendants provide transitional support services for medical claims processing, appeals and grievances, call-center support, enrollment and eligibility services, access to form templates, pharmacy services, disease management, Medicare risk-adjustment services, quality-assurance services, and such other transition services that are reasonably necessary for the acquirer to operate the Divestiture Assets. Defendants will not provide these transitional support services for more than twelve months without approval from the United States. Likewise, if Defendants fail to divest the Divestiture Assets by May 15, 2008, Section IV(T) requires United, at the discretion of the United States, to submit all necessary filings to CMS to ensure that the acquirer of the Divestiture Assets (or United, prior to sale of the assets) would be able to continue to offer Medicare Advantage plans in the Las Vegas area.

From the date that United sells the Divestiture Assets until March 31, 2010, Section IV(G) of the proposed Final Judgment prohibits United from entering into agreements with HealthCare Partners, Physicians IPA, Inc., or Summit Medical Group for any type of individual Medicare Advantage plan of Defendants in the Las Vegas area. Currently, these health care

11

providers participate in United's Medicare Advantage network, but do not participate in Sierra's. The purpose of this requirement is to insure that the acquirer of the Divestiture Assets is placed in the same competitive position with respect to the merged company as United has today with respect to Sierra.

In addition, Section IV(H) prohibits United from using the AARP brand for any of its individual Medicare Advantage plans in the Las Vegas area from the date that United sells the Divestiture Assets until March 31, 2009, and from using the SecureHorizons brands for any individual Medicare Advantage plans in the Las Vegas area from the date that United sells the Divestiture Assets until March 31, 2010. This prohibition will give the acquirer of the Divestiture Assets time to establish its own brand and reduce beneficiary confusion as to which company operates the plan in which the beneficiary is enrolled.

Section V of the proposed Final Judgment permits the appointment of a Monitoring Trustee by the United States in its sole discretion, subject to the Court's approval. If appointed, the Monitoring Trustee will have the power and authority to monitor Defendants' compliance with the terms of the Final Judgment and the Hold Separate Order. The Monitoring Trustee will have access to all personnel, books, records, and information necessary to monitor such compliance, and will serve at the cost and expense of United. The Monitoring Trustee will file monthly reports with the United States and the Court setting forth Defendants' efforts to comply with their obligations under the proposed Final Judgment and the Stipulation.

Section VI of the proposed Final Judgment provides that in the event the Defendants do not accomplish the divestiture within the period prescribed in the proposed Final Judgment, the Court will appoint a trustee selected by the United States to effect the divestitures. If a trustee is

appointed, the proposed Final Judgment provides that Defendants will pay all costs and expenses

of the trustee. The trustee's commission will be structured so as to provide an incentive for the

trustee based on the price obtained and the speed with which the divestitures are accomplished.

After his or her appointment becomes effective, the trustee will file monthly reports with the

Court and the United States setting forth his or her efforts to accomplish the divestiture. At the

end of six months, if the divestitures have not been accomplished, the trustee and the United

States will make recommendations to the Court, which shall enter such orders as appropriate, in

order to carry out the purpose of the trust, including extending the trust or the term of the

trustee's appointment.

## IV. REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been

injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to

recover three times the damages that the person has suffered, as well as costs and reasonable

attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing

of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act,

15 U.S.C. § 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent

private lawsuit that may be brought against defendants.

## V. PROCEDURES AVAILABLE FOR
## MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and defendants have stipulated that the proposed Final Judgment may

be entered by the Court after compliance with the provisions of the APPA, provided that the

13

United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty days of the date of publication of this Competitive Impact Statement in the Federal Register or the last date of publication in a newspaper of the summary of this Competitive Impact Statement; whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> Joshua H. Soven
> Chief, Litigation I Section
> Antitrust Division
> U.S. Department of Justice
> 1401 H Street NW, Suite 4000
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI.  ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against defendants. The United States could have continued the litigation and sought preliminary and permanent injunctions against United's acquisition of Sierra. The United States is satisfied, however, that the divestiture of the assets and other relief contained in the proposed Final Judgment will preserve competition in the product and geographic markets identified in the Complaint. Thus, the proposed Final Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII.  STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

> (A)  the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B)  the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint

15

> including consideration of the public benefit, if any, to be derived from a
> determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is

necessarily a limited one, as the government is entitled to "broad discretion to settle with the

defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d

1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp.

2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act).[3]

As the United States Court of Appeals for the District of Columbia Circuit has held,

under the APPA a court considers, among other things, the relationship between the remedy

secured and the specific allegations set forth in the government's complaint, whether the decree

is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may

positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy

of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what

relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988)

(citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56

F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001). Courts have

held that:

> [t]he balancing of competing social and political interests affected by a proposed
> antitrust consent decree must be left, in the first instance, to the discretion of the
> Attorney General. The court's role in protecting the public interest is one of
> insuring that the government has not breached its duty to the public in consenting

---

[3] The 2004 amendments substituted "shall" for "may" in directing relevant factors for court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest*." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[4] In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v.*

---

[4] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

*United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id*. at 1459-60. As this Court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The language wrote into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended

18

proceedings which might have the effect of vitiating the benefits of prompt and less costly

settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of

Senator Tunney).  Rather, the procedure for the public interest determination is left to the

discretion of the court, with the recognition that the court's "scope of review remains sharply

proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F.

Supp. 2d at 11.[5]

---

[5] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized."); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.").

## VIII. **DETERMINATIVE DOCUMENTS**

There are no determinative materials or documents within the meaning of the APPA that were

considered by the United States in formulating the proposed Final Judgment.

Dated:  February 25, 2008                     Respectfully Submitted,

*Peter J. Mucchetti*

Peter J. Mucchetti (D.C. Bar # 463202)
Mitchell H. Glende
N. Christopher Hardee (D.C. Bar # 458168)
Tiffany C. Joseph-Daniels
Barry J. Joyce
Ryan M. Kantor
John P. Lohrer (D.C. Bar # 438939)
Richard S. Martin
Natalie A. Rosenfelt
Michelle Seltzer (D.C. Bar # 475482)
Attorneys
Litigation I Section
Antitrust Division
United States Department of Justice
City Center Building
1401 H Street NW, Suite 4000
Washington, D.C. 20530
(202) 307-0001
(202) 307-5802 (facsimile)